ANNA B. FLEMING, Appellee, v. ROBERT J. FLEMING et al., Appellants.

PARTNERSHIP: The Relation—Partnership (?) or Joint Tenancy (?)

1   A partnership, and not a joint tenancy, is created by a series of contracts which provided:

   1. That the four parties will employ all their property, labor, time, and energy in the business;

2. That the only interest which each party shall have in the property or its accumulations shall be the amount which he may draw out, with the consent of the others;

3. That, on the death or withdrawal of any one of the parties, all interest of such party in the business and in its property shall cease, and pass *ipso facto* to the survivors or the survivor.

SALINGER, J., dissents.

**JOINT TENANCY:** Commercial Enterprise. A joint tenancy may not exist in a commercial enterprise, i. e., the business of life insurance.

SALINGER, J., dissents.

**PARTNERSHIP:** The Relation—Implied Agreement to Share Losses. An agreement to share in the *losses* of a business will be implied from an agreement by several parties to employ all their property, labor, time, and energy in the business, and each share in the *profits*.

**DESCENT AND DISTRIBUTION:** Surviving Spouse—Survivorship in Partnership Property. A provision in articles of partnership that, upon the death of a partner, his interest in the partnership property *shall pass to the surviving partners*, is an attempt to make a testamentary disposition of the interest of the deceased partner in the partnership property, and is void, in so far as it affects the claim for distributive share of the surviving wife of the deceased partner. (Sec. 3366, Code, 1897; Sec. 3376, Code Supp., 1913.)

**WILLS:** Agreement to Make Subservient to Widow's Share. The pooling under contract of all the separate property, earnings, and labor of several parties in a common enterprise represented by a corporation, in which each takes equal stock holdings which he assigns in blank and keeps in a place accessible to all the parties, *with an agreement that, on the death of any party, his interest shall pass absolutely to the survivors or survivor*, constitutes, by virtue of the italicised clause, a contract to make a will, which will not be allowed to prevail against the demand of the widow of a deceased member for her distributive share.

SALINGER, J., dissents.

**CORPORATIONS:** Ineffectual Transfer. The assignment in blank by each of several parties of their separate and equal stock holdings in a corporation, and the keeping of said assignments in a receptacle accessible to all the parties, under an agreement that, on the withdrawal or death of a party, his stock shall pass absolutely to the survivors or survivor, leave each party with an equitable prop-

erty interest, which constitutes a descendable estate, in which the widow of a deceased member has an arbitrary right to her distributive share, notwithstanding the provision relative to survivorship.

SALINGER, J., dissents.

CONTRACTS: Legal and Illegal Mutual Promises. A contract which
7 finds supporting consideration only in equal, mutual, and reciprocal promises, some of which are, and some of which are not, legally performable, may not be given force and effect beyond that point to which the legally performable promises will carry it.

DOWER: Insurance Payable to Surviving Partner. A wife has no
8 right to a distributive share in the proceeds of a life insurance policy on the life of her husband and payable to the surviving members of a partnership of which the husband is a member; and especially so when the policy premiums are carried by the partnership, and when the policy is pledged as collateral security for a loan to the partnership.

*Appeal from Polk District Court.*—CHARLES A. DUDLEY, Judge.

DECEMBER 16, 1919.

SUPPLEMENTAL OPINION, DECEMBER 20, 1920.

SUPPLEMENTAL OPINION, SEPTEMBER 28, 1921.

REHEARING DENIED SEPTEMBER 23, 1922.

ACTION by a widow, to have her distributive share ascertained, determined, and set off, in what she claims to be partnership property. The defense is that the property was owned in joint tenancy, and is, therefore, not subject to her claim to dower therein. Decree for the plaintiff in the court below. Defendants appeal.—*Modified and affirmed.*

*William E. Miller* and *Albert B. Cummins,* for appellants.

*Parsons & Mills,* for appellee.

GAYNOR, J.—This action is in equity, brought by Anna B. Fleming, as the surviving widow of Charles Fleming, against

his surviving brothers, as individuals, who, named in the order

1. PARTNERSHIP:
the relation:
partnership (?)
or joint ten-
ancy (?)

of seniority, are Robert J., John A., and Stan-hope Fleming; and against Fleming Brothers, an alleged partnership, composed of deceased and the three brothers above named; and against John A. Fleming, as administrator of the estate of Charles Fleming.

The plaintiff's claim is that her husband, Charles, died seized and possessed of an interest in certain property now in the possession of and held by these defendants; that they refuse to recognize her right to a distributive share therein, and claim to own the same, as against the right asserted by her.

The original purpose of the action was to have ascertained and set aside to her, as the surviving widow of Charles, her distributive share in so much of the property as her husband died seized or possessed of. She claims that he died seized and possessed of an interest in the property now in the hands of these defendants, or some of them.

Here the issues are narrowed to the ascertainment of whether or not plaintiff's husband, Charles, died seized or possessed of any interest in the property held by these defendants, or some of them. If it be determined that he had an interest in the property at the time he died, then she is entitled to a distributive share therein, and her claim must be recognized and enforced; but the amount of her interest is not the subject of investigation at this time; for, by agreement of parties, this is left for future consideration and determination by the nisi prius court. The determination of the question here involves only the proper construction of the three writings on which defendants rely to defeat her claim, to which specific reference will be made hereafter.

It appears that, up to and at the time Charles died, Fleming Brothers, including the deceased, Charles, owned quite a large estate, consisting of both real and personal property. The question to be determined is whether this property was owned by these four brothers as joint tenants, with a right of survivorship, or whether it was owned by them as partners. It is the claim of the defendants that all the property in controversy, prior to and at the time of Charles's death, was held by these

four brothers as joint tenants, to which the right of survivor-
ship attached; that, upon the death of Charles, all his interest
in the property ceased, and this by virtue of the terms of cer-
tain written instruments under which the business was con-
ducted and the property acquired and held at the time Charles
died.

Charles Fleming, the deceased, was married to the plaintiff
on the 2d day of January, 1880, and died in Polk County,
January 15, 1916.

The first instrument on which the defendants rely to cut
off this widow from a right to share in the accumulations of all
these years of her husband's faithful service and toilsome labor,
represented by the property in question, was made on the 14th
day of December, 1896, and at a time when but a small portion
of the accumulated fortune which is the subject of this litiga-
tion had come into existence. It reads as follows:

"Know all men by these presents, that we, Robert J. Flem-
ing, Charles Fleming, John A. Fleming, and Stanhope Fleming,
of the city of Des Moines, state of Iowa, in order to provide for
the future uninterrupted prosecution of the business of life
insurance in which we are now or may be hereafter engaged and
mutually associated, and to fix and determine the interests of
each therein, hereby mutually agree, and bind ourselves, our
heirs, executors, administrators or survivors and all other per-
sons, that, each of the parties to this stipulation and agreement,
shall have only such share of, and interest in the profits, earn-
ings and income of the business of life insurance in which we
are or shall be jointly engaged, as shall be actually received by
each or paid upon the order of each, with the consent of the
others, from the income of said business. And such amount so
paid shall fully represent the share and interest of each of the
·parties hereto, at any time while we the undersigned shall be
associated together in said business or thereafter. Upon the
death or withdrawal of any party hereto, all his interest in said
business shall thereupon cease and determine and at no time
shall any accounting be made or required to be made by any
party hereto, his representatives, executors, heirs or survivors,
or any other person claiming under him, or to any person of-
ficer or representative, upon any basis of labor performed or

money received on account of said business by any of the parties hereto or otherwise. And it is distinctly understood and agreed between the parties hereto that they, nor any of them have, or can have any property rights, or money interests in said business other than that herein specified and defined, and any sum of money paid to or for any party hereto shall be in full of the interest of said party in said business.''

No doubt deeming that this instrument did not fully express the purpose and intent of the parties, and might not be construed to effectuate their purpose and intent, they made a second instrument on the 23d day of January, 1897, as follows:

''Know all men by these presents that we, Robert J. Fleming, Charles Fleming, John A. Fleming and Stanhope Fleming of the city of Des Moines, Iowa, in view of our past association in, and the manner of the conduct of our business without the usual and ordinary incidents of a partnership, and to more effectually define and determine our individual interests in said business in the future, as between ourselves and in relation to all other persons, and to provide for the future uninterrupted prosecution of said business in which we are now engaged, or may be hereafter associated, hereby mutually agree and bind ourselves, our heirs, executors, administrators, survivors, and all other persons as follows: That in consideration of the services of each of us rendered, or hereafter to be rendered in the business of life insurance, of the income to be derived therefrom and of the mutual stipulations herein contained, each of the parties to this agreement has, and hereafter shall have, only such share of, and interest in the profits, earnings, renewals due or to become due under any and all contracts of insurance, or commissions thereon, to whomsoever nominally payable in the business of life insurance in which we are now or any of us shall hereafter be jointly engaged, as shall be actually received by each, or shall be paid upon the order of each with the consent of the others, from the general funds or income of said business; and any sum or amount so paid shall fully represent the share and interest of each of the parties hereto at any time while any of the undersigned shall be associated together in said business or thereafter. It is further agreed that upon the death or withdrawal of any party hereto, all his interest in said busi-

ness, and in the assets thereof, shall thereupon cease and determine; and at no time shall any accounting be made, or required to any person, or any party hereto, or their heirs, executors, administrators, survivors or representatives. It is further stipulated and agreed that any and all contract rights, and all interest in renewals of policies of insurance in the Mutual Life Insurance Company of New York, due or to become due since January, 1893, all commissions, earned or hereafter to be earned, and all bonuses, allowed, payable or to become payable in any manner, whether payable to or standing in the name of Robert J. Fleming or any other of the parties to this agreement, are hereby assigned and transferred to, for the mutual benefit of the parties hereto, to be used, applied and disposed of in the manner only as herein agreed and provided for. It being the intention of all the parties to this agreement, and they hereby declare that they, nor any of them have, or can have any property rights or money interest in said business other than that herein specified and defined, so long as any of them shall be associated together in the business of life insurance.''

Under these two instruments, they continued their labors and prosecution of the business in which they were engaged and mutually associated, and further property was accumulated through the joint efforts, and a large estate created. However, on the 7th day of January, 1911, feeling that they had not yet fully expressed in writing their relationship to each other and to the estate that had been and was being accumulated, they made a third writing, as follows:

"Whereas, the undersigned, Robert J. Fleming, Charles Fleming, John A. Fleming and Stanhope Fleming are engaged in the life insurance business in the states of Iowa, Nebraska and Wyoming under a contract with the Massachusetts Mutual Life Insurance Company; and,

"Whereas, each of the undersigned is the owner of one fourth of the stock of a corporation organized under the laws of the state of Iowa known as Fleming Brothers, Incorporated; and

"Whereas, the undersigned also are the owners of certain

real estate and other property in which each of them is interested; and,

"Whereas, the undersigned expect to acquire additional property hereafter; and,

"Whereas, the said property now held and owned by the undersigned has been acquired by them with the understanding that it shall be disposed of as hereinafter set out;

"Now, therefore, in consideration of the premises and one dollar in hand paid by each of the undersigned to each of the others whose names are signed hereto;

"This agreement made and entered into by and between the said Robert J. Fleming, Charles Fleming, John A. Fleming and Stanhope Fleming on the 17th day of January, A. D. 1911, will witness:

"1st.   That the partnership between the undersigned is with the express and distinct understanding and agreement that all of the property heretofore acquired by the undersigned has been acquired as the results of the said partnership, and that said property now belongs to the said partnership, including all proceeds of said insurance business with the renewals to which the parties hereto may be entitled thereon,

"2d.   That upon the death of either one of the undersigned, the property then owned by the said partnership, including all property standing in the names of the individual partners which embraces said stock in Fleming Brothers, Incorporated, shall be and become the property of the surviving brothers of the said partnership; and that what said decedent has theretofore withdrawn from said partnership shall constitute his sole and entire interest therein, and the sole and entire interest of his estate therein.

"The premiums upon all insurance carried by the undersigned, whether life or accident, (except Policy No. 741051 in the Mutual Life Insurance Company of New York, upon the life of Robert J. Fleming, payable to Emma D. Fleming, his wife, which policy is not a part of said partnership property) have been paid by the said partnership, and the said partnership is entitled to the proceeds of all such insurance except the policy above referred to payable to Emma D. Fleming.

"3d.   This contract covers not only the property now

owned, but also property hereafter acquired, and all hereafter acquired property, including the proceeds of life insurance, whether standing in the name of the said individuals, or either of them, or in the firm name, is understood to be firm property, unless there be an express agreement to the contrary.

"Executed in quadruplicate."

In this third instrument, the parties to the first two instruments have undertaken to define the relationship existing between them, and to more clearly state the relationship they sustained to the property, and to define more clearly what they meant when they said in the first two contracts, "In order to provide for the future uninterrupted prosecution of the business of life insurance, in which we are now or may be hereafter engaged and mutually associated." This last quoted instrument is the last expression of these parties touching the subject-matter of all three contracts; and they themselves have therein stated, in words that have definite and legal signification, what they understood the relationship was, under which they were operating.

We look to what is written in these three instruments, taken as one instrument, to find the thought that lies back of the writing,—the purpose and intent of the parties in the making of the writing,—and to find the legal status that the writings create. That these parties had a purpose and an intent to accomplish something touching their rights, duties, and obligations to each other in the making of the instruments, and a purpose to fix the rights of each in the property accumulated and to be accumulated, must be assumed. Within these instruments the height, depth, width, and length of that purpose must be found. The thought of the brothers could not have been that the title to the property acquired, as it came into existence, should vest in no one, except the portion taken and appropriated by each to his immediate needs. The title to property that can be the subject of ownership, we must assume, vests in someone, whether it be an individual, individuals, or a legal entity. This property, when it came into existence, vested in these brothers. They became vested with the title as joint tenants, or they became vested with the title as tenants in common, or they became vested with the title as a copartnership. The character of the title held by these defendants is the subject of our investigation,

and controls the rights of this plaintiff. Within the cover of these writings must be found all that these men had in mind touching their personal relationship, and their relationship to and interest in the property accumulated by the joint efforts. As the third writing is the last expression of the minds of all these parties touching their relationship to each other and to the property, it might well be considered the controlling expression, determinative of their relationship and their rights in and to the property at the time Charles died. The property in question came into existence only by the joint efforts of these men, working hand in hand, shoulder to shoulder, in a common enterprise, with a common purpose. That purpose was the accumulation of property; the building up of a fortune. During the years that have passed by, each has labored faithfully; and through his labor, joined with the labor of his brothers, the subject-matter of this controversy has been created. What they have said in these contracts and what they have done in execution of the purpose therein expressed, constitute the only expression of the thought and purpose to which our minds are directed. These writings, considered together, show the mutual understanding and purpose of the parties.

We need not here enter into any discussion of the origin and purpose of a joint tenancy. Its origin and character were feudal. It was of English origin, and highly favored, at first, 2. JOINT TENANCY: for reasons that were feudal. But whatever commercial enterprise. causes may have led to the origin of such an estate or commended it to the minds of the great jurists of that time, it unquestionably has grown into much disfavor in this country and in England. Some states have denied the existence of it in any except real property. See *Hart v. Hart,* 201 Mich. 207 (167 N. W. 337). Some have abolished it altogether, and some require strict proof. It has been condemned because it imperils the future of those whom the law assumes to guard and protect. Under our law, the wife, the weaker vessel, the one who maintains the home and rears the children, is entitled to have provision made for her, if, peradventure, death robs her of the one legally and morally pledged to support and maintain her. She is entitled to share in such of his estate as by his efforts he accumulates and leaves at his death. The husband

cannot take this from her by any testamentary disposition. He cannot contract with her for its release. In view of the legal status of the wife, in view of the relationship which she sustains to her husband, in view of those provisions of statute that protect and guard her interest during his life and after he is dead, it would seem to be against the policy of the law, expressed in the statutes, to permit men to legally get together and agree with each other that, upon their death, their wives and children shall receive no portion of the estate which they spent their lives in accumulating. It is a clear fraud on the marital rights of the wife. Many a wife has been a faithful helper in the building of great fortunes. Many a wife, by economy and self-denial, has been a strong factor in the building. Yet we are asked to say that this wife, who has done faithful service and practiced self-denial for 36 years, that something might be left for declining years, must be left penniless. These are some of the features that bring this kind of tenancy into disfavor, and show that it cannot be made to defeat a wife's claim under the statute.

The essential elements of an estate in joint tenancy are that it be held by two or more jointly, with a clear right in all to share in the enjoyment of the thing during their lives. There are four requisites: The tenants must have one and the same interest. The interest must accrue by one and the same conveyance, except as modified by the statute of uses. They must commence at one and the same time, and the property must be held by one and the same undivided possession. If such an estate be recognized, and the right of parties to create it, with all its unnatural consequences, the consequences that legally flow from it must be permitted to flow, no matter what this court may think of the justice or injustice of it, and though it leave this wife to the cold charity of an unsympathetic world. In none of the writings did these brothers bind themselves to make any provision for her. If she receive aught from them, it comes to her, not as a matter of right, but as a matter of grace.

It is true that, under the common law, an estate may be created and held in joint tenancy. The estate is joined in the number of persons interested. No matter what the number of parties interested may be, the tenants are regarded as one individual. The right that each has in the joint estate continues

during his life, and terminates with his death. The survivors, still considered as one person, hold the estate by right of survivorship. The last survivor takes the whole estate, and then it becomes, for the first time, an estate of inheritance, and passes to his heirs or legal representatives. While the tenants are considered as one person, and the estate joint, yet each of the tenants has a moiety interest. Or, in other words, while each joint tenant is regarded as having the whole of the estate, his interest in the estate may be put to an end or severed during his life. Each joint tenant, during his life, may dispose of his share by the usual modes of conveyance; but if he die without making such disposition, the title to the thing which is the subject of the joint tenancy remains in the survivor or survivors, free from the share or moiety of the one who dies. At common law, the sale by a joint tenant of his share during his life was regarded as a cutting-off of that share from the joint tenancy, and that share then was discharged from the incidents of joint tenancy, and passed to the grantee, to be held as a tenancy in common. But unless some disposition is made by one of the joint tenants of his interest, and the estate is permitted to remain as a joint tenancy until death, it remains by the right of survivorship in the other tenants. So, as between themselves, each tenant has a distinct right, but the rights of all the tenants are equal in every respect. So it is said that a joint tenancy is distinguished by unity of possession, unity of interest, and unity of title. It was the purpose of the feudal system to keep the title in one person; but this seems to have been touching lands only. In modern times, however, it has been recognized as a right in personal property as well, but never so recognized in this state, or generally, as applying to commercial enterprises.

Considering the foundation upon which the doctrine of joint tenancy rests, it is the opinion of this court that it does not apply to commercial enterprises of this kind, and that no joint tenancy can arise out of a commercial enterprise, such as we have here before us in this case. It is inconsistent with the very foundation principle upon which joint tenancy exists or can exist.

Analyzing these writings, we find that, at the time the first instrument was made, the parties had in mind that they were

associated together in some way not expressed in this writing, and engaged in a business from which mutual profit would arise, and out of which property of value would come; that each had, as long as he lived, a right to use a portion of the income and profits of the business in which they were so mutually associated; that, whenever his needs required, and to that extent only, he had a right to take from the earnings and income of the business such sum as he needed, upon the order or with the consent of the others. This provision was intended to cover the immediate needs of each of the parties so associated and engaged in the business. Its purpose evidently was to forestall any extravagant tendencies on the part of any of the brothers, and to conserve the interests and profits of the business, to the end that the business might not suffer from extravagance, and might be continued uninterrupted. To say that, when one of these parties took from the profits of the concern any sum of money, however small, to meet his immediate needs, the same, when taken, measured his interest in all the accumulations of the past years, could not have been intended to be literally construed.

If the parties were, in fact and in law, joint tenants, then each had a right to enjoy the income of the estate; and the fact that one of the tenants appropriated a portion of the income to his own use could not have the effect of destroying his interest in the subject-matter of the tenancy. The idea of joint tenancy is that each tenant has a right to an equal enjoyment of the thing which is the subject-matter of the tenancy. If the receiving of any portion of the income or the profits of the estate had the effect of destroying the interest of each in the subject-matter of the tenancy, then, upon the appropriation of any of the profits by the tenants, or any of them, the joint tenancy would cease. The provision of the contract above referred to must have been intended as limiting the right to enjoy the income and profits of the business, and not as taking his right in the subject-matter of the tenancy. His right to take was measured by his needs. What he took was a declaration, by the taking, of his then needs, and measured his right, at that time, to take to his personal use the income and profits. It does not mean that it measured or could measure his interest in the property accumulated by the joint efforts of the parties, or that the

sum of money received determined his interest in the property.

The second contract, though changed in wording, expresses practically the same thought, with the added purpose to transfer to the entity, whatever it is, all rights of Robert J., under his contract with the Mutual Life Insurance Company of New York.

It will be noted that, in the first two writings, no direct provision is made for the vesting of the title to accumulated property in any designated entity or person. It is now assumed by these defendants that it vested in the brothers as joint tenants. No estate in the tangible property that accumulated as a result of the business enterprise is by express provision vested in any person, persons, or entity. We turn, therefore, to the third writing, for further light as to the purpose and intent of these parties and the status created by the preceding writings.

It appears that, between the time of the making of the second contract and this third contract, Fleming Brothers had incorporated, or a corporation was created, known as Fleming Brothers, Incorporated. This corporation issued to each of the brothers stock in equal parts, we take it, and each undertook to assign his stock by writing his name on the back thereof, without naming the assignee, and deposited it in a receptacle which it is claimed was under the control of all four of the brothers. This third contract makes plain what is wanting in the other contracts, and says that they were associated together as a partnership, and that the partnership is with the express and distinct understanding and agreement that all the property heretofore acquired by the undersigned had been acquired as the result of said partnership, and that said property now belongs to said partnership. Reading the previous writings in the light of the revelations made in the third writing, it is not as difficult to understand and to give legal force and efficacy to what is therein said. We take it that these four brothers organized a partnership, with the understanding that the business carried on by the partnership should remain intact, and that the future of the business should be uninterrupted in its prosecution; that the title to the earnings and income of the business—the accumulated assets—should vest in the partnership; that each party should have a right to take, with the consent of the others, so much of the earnings of the partnership as his needs demanded,

be this great or small; that he should never afterwards be called on to account to the partnership therefor. Their labors were all in the interest of the partnership. The only source from which a livelihood could come was through the earnings and income of the partnership for which they labored. They evidently had confidence in each other; confidence that each would labor to his fullest extent in the interest of a common enterprise, and that each would be frugal, and take no more from the earnings and profits of the partnership than was necessary to meet his personal needs; and so the restriction was made as it appears in the first and second contracts,—in fact, in all the contracts. Each, having confidence in the integrity of the other, agreed that no accounting should be had of their labor: that is, they would assume that the labor of each equaled the labor of the other in the interests of the partnership. The desire was to keep the partnership a going concern, and that there should be no interruption in the prosecution of the business; that no one should be permitted to draw from the company, for his personal use or otherwise, any sum of money that might tend to cripple the partnership in the prosecution of the business for which it was created. After they had organized the corporation, an aliquot part of the corporate stock was issued to each of the brothers. Each brother undertook to assign the stock issued to him. The assignment was made in blank; but we find that it was intended to be assigned to Fleming Brothers, a partnership, though it was not named as assignee. It is further said in the third writing that it is made with the understanding that all the profits heretofore acquired by said partnership have been acquired as the result of said partnership, and that said property now belongs to said partnership, including all property of said insurance business, with the renewals to which the parties hereto may be entitled thereon. And we have them saying in this third writing:

"We are engaged as partners in the life insurance business, mutually associated together as partners, and as such we desire to provide for the future uninterruption of the business in which the partnership is engaged."

But it is said that the fact that they called themselves partners, or that they were there engaged in a common enterprise

or business, is not controlling; that there is nothing in a name; that the relationship must be determined from the entire writing; that the writing does not disclose all elements that are essential to constitute a partnership; that a partnership is a contract, and the contract determines the relationship of the parties to each other, and whether a partnership exists; that the mere fact that they, in this third writing, say many times that they are partners, that a partnership exists, that the property is held by a partnership, does not determine their relationship to the property, or their interest in the property, or the character of the association by which their interests are united.

A slight history of the origin of partnership will not be out of place at this time. Originally, it was founded on confidence, independent of any contractual relationship. Because of the fact that, in the early days, families followed one occupation, these partnerships usually were found to exist among relatives. Though founded in confidence in the early days, in modern times it was recognized as a contractual relationship. It grew out of the necessities of trade, but confidential relationship was retained in the modern law. At the time the law courts first gave cognizance to what is known as partnership relationship, they were familiar with tenancies in common and joint tenancies. However, under joint and common tenancies, the co-owners sustained no confidential relationships to each other,— at least, not such as is found in modern partnerships; and the right of agency did not exist among the joint co-owners. After passing through many stages of formation, the law came to regard partnership as an entity, something separate and distinct from the individuals, and in some respects, much the same as a corporation is separate and distinct from its stockholders. At common law, a partnership was nothing more than an association of individuals. A firm was recognized as a short form of expression to designate partners collectively. The early decisions touching partnership depend a great deal on the viewpoint of the particular judge,—whether he had a mercantile conception or a common-law conception of a partnership; so that the courts have sometimes reached different conclusions, although the facts upon which they based their conclusions were substantially the same. Originally, there were different theories

of partnership. One was that it was a separate entity, like a corporation; the other, that it was a mere association of natural persons. Some consider it a status something like marriage. We find, however, Chancellor Kent defining it thus (3 Kent's Commentaries 23):

"A contract of two or more persons, to place their money, effects, labor, and skill, or some, or all of them, in lawful commerce or business, and to divide the profit, and bear the loss, in certain proportions."

Other writers define it as a combination of two or more persons of capital or labor or skill, for the purpose of business for their common benefit. Gilmore on Partnership, on pages 1 to 6, defines it thus:

"Partnership is a relation existing by virtue of a contract, express or implied, between persons carrying on a business owned in common, with a view of profit to be shared by them."

It is defined in the English Partnership Act of 1890, 53 and 54 Victorian, Chapter 39, Paragraph 1, as "the relation which subsists between persons carrying on a business in common, with a view of profit."

Partnership implies that there is more than one person interested in it, and there is implied a mutual consent to the association; but that is not controlling, since there may be organizations, by mutual consent, which are not partnerships, such as churches. A partnership, in its true sense, is formed for the purpose of trade or business, and the profits realized from the business must be the property of the persons associated, if they are to be treated as partners. *Missouri Bottlers' Assn. v. Fennerty,* 81 Mo. App. 525; *Burt v. Lathrop,* 52 Mich. 106.

As between the parties, the true test as to whether or not they are associated as partners is the intention with which they have entered into the relation. It is the legal intent or manifest

3. PARTNERSHIP: the relation: implied agreement to share losses. intent of the parties that determines whether a partnership exists. In determining whether the parties to a contract intended to become partners, the court will take into consideration the whole situation existing at the time the agreement was made, and all the circumstances surrounding the transaction, as well as the subsequent admissions of the parties. That it is not denominated a part-

nership in the contract is not fatal. Where the agreement contains all the elements necessary to create a partnership, then the intention of the parties is clear, and none of the tests which are applied to determine whether a partnership exists are needed. But where the contract contains only part of the elements of a true partnership, and it becomes important to ascertain the intent of the parties, legal tests may be applied. It follows that, where persons enter into an agreement to engage in a joint enterprise, and agree to share the profits, a presumption arises that they intend to be partners, as between themselves. It is only made stronger by proof of an express agreement to share profits and losses. Where there is an agreement to engage in a business for the common good of all, and each agrees to devote his entire time to the business, and each is to share in the profits of the business, it is necessarily implied that each must share in the losses of the business; and especially may it be implied when, as in this case, each of the parties has agreed to put all his property, all his labor, all his time, and all his energies into the business. It may then be assumed that he subjects himself, by so doing, and agrees to subject himself, to all the losses which flow from the enterprise; for he has staked his all upon the cast, and he must stand the hazard of the die. So it follows that, though we find in this contract no express agreement to share losses, the wording of the contract and the character of the business are such that it is inevitable that each must have intended to share the losses.

It must be borne in mind that the right of survivorship is only an incident to joint tenancy. It follows as a legal consequence from the creation of the joint tenancy. The joint tenancy, when created, vests in each of the tenants a common right in the property, which does not survive his death, unless he becomes the last survivor of all the tenants. Then, for the first time, does that which before consisted, in a practical sense, of a life estate in the property, become vested as an estate of inheritance. In a legal sense, his death does not transfer the rights that he possessed in the property to the surviving tenants. Death does not enlarge or change the estate. Death terminates his interest in the estate. It is rather a falling away of the

4. DESCENT AND DISTRIBUTION: surviving spouse: survivorship in partnership property.

tenant from the estate than the passing of the estate to others. It remains with the surviving tenants jointly; while in a partnership, the partner is vested with an estate that survives his death. He has always an inheritable estate, so long as he lives; and on his death, that interest passes to his legal representatives; so that, in a partnership, when one partner dies, his legal representatives become vested with whatever interest he had in the partnership, and his wife to her distributive share. He dies, then, possessed of an estate that passes to his legal representatives. His wife's share cannot be affected by any testamentary disposition made by the husband. It can be affected by no disposition made by the husband which must take effect after his death, and not effectual during his lifetime. So it follows that, in this property, the deceased had an inheritable interest. On his death, it passed to his legal representatives, and his wife became vested with her distributive share, which must be recognized and enforced.

We find, therefore, that a partnership existed between these parties. The provision, therefore, in the contract that, upon the death of any member, his interest in the partnership property should pass to his brother partners, is an attempt to make a testamentary disposition of the interest of each partner. A fair consideration of all these instruments shows that they were not understood as creating a joint tenancy. It fairly shows that all the brothers understood that they were associated together as partners, and that a partnership existed. An attempt to create survivorship among partners is an attempt to make a testamentary disposition of the dying partner's property, or his interest in the partnership property, in favor of the surviving partners, to take effect after his death.

We are satisfied with the decree of the district court, and its judgment is affirmed.—*Affirmed.*

LADD, C. J., WEAVER, EVANS, PRESTON, and STEVENS, JJ., concur.

SALINGER, J. (dissenting.)  I.  The majority opinion is fine literature.  It discloses much research and learning.  It is clear in the statement of thought units.  On first reading,

while reading, one finds nothing to differ from. Having finished, there seems to be nothing objectionable that is outstanding. Somewhat later, one finds a qualm of unrest suggested, such as sometimes follows too enjoyable a banquet. The reader can readily recall many fine passages and sound statements of law. But it now occurs to him that he cannot so readily understand why the opinion affirms. On another reading, made for the purpose of getting clear on this point, he does find some grounds for affirmance stated. Part of them are buried in the argument, and all the grounds are few in number. Every reason set forth as a ground for affirmance is contrary to well settled law, and to both older and recent decisions in this court. In some of these opposing decisions, the writer of the majority opinion and some of those who now join him spoke for the court. The opinion makes no reference to any of these. In a word, the final conclusion would seem to be reached because every argument urged in its support is untenable.

Reference has been had to grounds buried in argument. Some confusion exists as to what is argument, and what is relied upon as a ground for the final conclusion reached. In this class are attempts to construe the three writings into which the parties entered. This construction deals with the purpose and object of the writings,—the relation of each of the writings to each of the others, and to all three; and it singles out one part of the writings and construes it to mean what it most clearly does not say. I may as well say at this point as say it anywhere that, in my opinion, this case presents no writings to be construed; that the writings themselves are so clear that no judicial construction is warranted; that here there is no question as to what was done and intended; and that the sole question is, What is the effect of that which has been written? To what that effect is, I shall, of course, recur later.

The majority declares:

"The determination of the question here involves only the proper construction of the three writings on which defendants rely to defeat her claim;" that "within the cover of these writings must be found all that these men had in mind touching their personal relationship, and their relationship to and interest in the property accumulated by the joint efforts."

It declares that we must look to "what is written in these three instruments, taken as one instrument, to find the thought that lies back of the writing,—the purpose and intent of the parties in the making of the writing." It is said that "within these instruments the height, depth, width, and length of that purpose must be found;" and that to the three writings, construed as one, we must look to determine status created by the writings, and whether the three create a joint tenancy. There is more along the same line; but this must suffice to point out that it is recognized, for the time being, that the question before us must be resolved by treating the three writings together, as expressing what there is to decide. With this much I am in full accord. I do not find it so easy, however, to be in accord also with other parts of the opinion, wherein it is declared that we must turn to the third "for further light as to the purpose and intent of these parties and the status created by the preceding writings;" that this is so, for one thing, because the last writing "is the last expression" as to the "subject-matter of all three contracts;" and that "it might well be considered the controlling expression, determinative of their relationship and their rights in and to the property," because it is the last expression. I pass, without further comment, the naked fact of the contradictoriness of these positions, and next address myself to a consideration of what is, in truth, the relative standing of the three writings. It is true that some of the later writings express the idea that the makers deem them necessary to clarify earlier ones. But I venture to deny that either the first or second writing need any clarifying. I venture to assert that none of the writings did any clarifying; that no material change was worked by any writing in any former one; that the last is no more controlling than the first; and that in this case there is the common case of doing much needless writing, and yet leaving all that is written too clear for the need of interpretation on part of a court. A short analysis of each of the three writings will, I think, demonstrate this,—will demonstrate that, in all vital particulars, each of the three writings makes like provision and clear provision.

In the first, the object is stated to be "to provide for the future uninterrupted prosecution of the business of life insur-

ance in which we are now or may be hereafter engaged and mutually associated.'' The second declares it is made in view of the fact that the past association of the makers and the manner of conducting their business has been ''without the usual and ordinary incidents of a partnership,'' and is made ''to more effectually define and determine our individual interests in said business in the future, as between ourselves and in relation to all other persons, and to provide for the future uninterrupted prosecution of said business in which we are now engaged or may be hereafter associated.'' The only change, if it can be said to be one, which is made on this point by the third writing is that it has a more specific reference to an existing partnership than have any of the others. It recites:

''That the partnership between the undersigned is with the express and distinct understanding and agreement that all of the property heretofore acquired by the undersigned has been acquired as the results of said partnership, and that said property now belongs to the said partnership, including all proceeds of said insurance business with the renewals to which the parties hereto may be entitled thereon.''

And it recites that each signer owns one fourth of the stock in the corporation known as Fleming Brothers, Incorporated. One part of the second writing makes specific reference to certain things that the parties shall own, by assigning and transferring ''for the mutual benefit of the parties hereto'' certain renewal commissions and ''all commissions earned or hereafter to be earned, and all bonuses allowed, payable or to become payable in any manner, whether payable to or standing in the name of Robert J. Fleming or any of the other parties to this agreement, * * * to be used, applied and disposed of in the manner only as herein agreed and provided for.''

The third contract makes the first reference to the following fact: ''Said property now held and owned by the undersigned has been acquired by them with the understanding that it shall be disposed of as hereinafter set out;'' that said property includes certain real estate; and that it is purposed to acquire more by means of what will be realized from the joint business.

There are provisions which, for convenience in further ref-

erence, I will set out in a group, denoting the writing in which the matter is found by a numeral in a bracket.

There is a declaration that the purpose is to fix and determine the interest of each and of all signers.   (1)

It is distinctly understood and agreed by the parties hereto that they nor any of them have or can have any property rights or money interests in said business, other than that herein specified and defined.   (1)

"In consideration of the services of each of us rendered, or hereafter to be rendered in the business of life insurance, of the income to be derived therefrom and of the mutual stipulations herein contained, each of the parties * * * has, and hereafter shall have, only such share of, and interest in the profits, earnings, renewals due or to become due under any and all contracts of insurance, or commissions thereon, to whomsoever nominally payable in the business of life insurance in which we are now or any of us shall hereafter be jointly engaged, as shall be actually received by each, or shall be paid upon the order of each with the consent of the others, from the general funds or income of said business."   (2)

"It being the intention of all the parties to this agreement, and they hereby declare that [neither] they, nor any of them have, or can have any property rights or money interest in said business other than that herein specified and defined, so long as any of them shall be associated together in the business of life insurance."   (2)

"And any sum or amount so paid shall fully represent the share and interest of each of the parties hereto at any time while any of the undersigned shall be associated together in said business or thereafter."   (2)

What one who has deceased "has theretofore withdrawn from said partnership shall constitute his sole and entire interest therein, and the sole and entire interest of his estate therein."   (3)

"It is further agreed that upon the death or withdrawal of any party hereto, all his interest in said business, and in the assets thereof, shall thereupon cease and determine; and at no time shall any accounting be made, or required * * * to any

party hereto, or their heirs, executors, administrators, survivors or representatives.'' (2)

Upon the death or withdrawal of any party hereto, all his interest in said business shall thereupon cease and determine (without right to accounting for the past.) This is repeated. (1—2)

The purpose is to bind survivors. (1)

''Upon, the death of either one of the undersigned, the property then owned by the said partnership, including all property standing in the names of the individual partners which embraces said stock in Fleming Brothers, Incorporated, shall be and become the property of the surviving brothers of the said partnership.'' (3')

It is manifest that, as to vital points, each of the three writings, in effect, repeats. It is manifest that the three read together are the contract, and a clear-cut one. What the contract is, is perfectly stated in the decree appealed from, to wit:

''Considering the terms of the agreements, it is clear they were made with an intent to establish a joint ownership of the property acquired by the brothers, with a right of survivorship, upon the death of a brother, in the surviving brothers or brother. Such intent and purpose appear in every contract. * * * The intent of the parties to the instrument set out above is clearly to create an estate, with the incident of survivorship.''

There is no just right to construe; and at the one point where most of the construing is being done, the construction is an erroneous one. I refer to the part which I have set out. That is where it is said over and again, and by repetition in different ones of the writings, that the share and interest of one who dies is what he has drawn out while he lived. It is the part which the majority holds was not intended to be ''literally'' construed. It is the part of an unmistakably clear contract which the majority amends by means of ''construction.'' The judicial amendment is this:

''This provision was intended to cover the immediate needs of each of the parties so associated and engaged in the business. Its purpose evidently was to forestall any extravagant tendencies on the part of any of the brothers, and to conserve the interests and profits of the business, to the end that the business

might not suffer from extravagance, and might be continued uninterrupted.''

I repeat, the words written are too plain to permit construction. The parties took great pains to say, and said most clearly and repeatedly, that they did not intend what the majority declares they did intend. I beg to add that the ''literal'' construction is demanded, because it is the only construction which is in harmony with the entire purpose of the contract. I mean by this that, if it was the purpose to cut off inheritable interest, and to give the share of one who predeceased to the survivor, it must have been intended that the only interest of the one dying first should be what he had received in life. For if his interest is more than that, he will die seized of property, and it will not go to his survivor, but to next of kin or devisees or both. In defining the interest and share to be what was received in life, the parties but recognized that they had contracted to cut off inheritable interest, and to create a survivorship. I venture to say that is what they did contract to accomplish. There is no warrant for saying that the part defining share and interest is not to be construed literally. There is better reason for saying that that part of the writings is needless. Once agreed that neither party shall have an inheritable interest, once agreed that, when one dies, all that remains belongs to the survivors, and, without more, it has been agreed that the interest of each is measured by what he receives before he dies. So when it is all said and done, we have a clear contract that whoever died first left nothing to inherit,—nothing for dower or marital rights to attach to; that, at his death, the title became complete and perfect in his survivors, and so on, until the last survivor was reached. As said, the only question is whether this is a lawful and enforcible contract. There is no question about what the contract is.

II. It may be conceded, for the sake of argument, that joint tenancy does not apply to ''commercial enterprises,'' and that neither in this state or generally has it been recognized that such tenancies can be created as to ''a commercial enterprise.'' But does that quite meet the situation? These parties attempted nothing as to their commercial enterprise. What they did do was to arrange concerning the moneys that might be realized

from such enterprise. Such moneys are not a commercial enterprise, but are personal property. If the insurance business were closed out and abandoned, the contracts would still have for operation all they ever had to operate upon. True, the inducement in the contract was the belief that the contract would tend to avoid interruption of the business. But the joint tenancy was in the property the business had or would get; the purpose, that death of one, as in the course of nature it would occur once and again, should not disturb the business by means of the drawing out that must occur when there is no agreement to cut off inheritable interest, and no survivorship contract. The joint tenancy was created to avoid all interruption by withdrawal of the earnings and property by deaths, until the one death of the last survivor. I do not overlook that the majority goes a step beyond, and holds that there can be no joint tenancy in property other than land. But in this I think it is clearly in error, and that no such rule prevails in this jurisdiction, or anywhere. In *Baker v. Syfritt*, 147 Iowa 49, we enforce a contract creating survivorship, both as to lands and personal property. In *Stewart v. Todd*, 190 Iowa 283, we enforce a survivorship agreement to cut off inheritable interest as to lands; also against some $18,000 worth of personal property.

III. The most definite ground assigned for the final conclusion is this: It is found that the relation between the parties was that of a partnership; next, that the provision creating survivorship as to the partnership property "is an attempt to make a testamentary disposition of the interest of each partner." Finally, that "an attempt to create a survivorship among partners is an attempt to make a testamentary disposition of the dying partner's property or his interest in the partnership property, in favor of the surviving partners, to take effect after his death." As a ground for affirmance, this finding can have but one construction, to wit: that a partnership cannot enter into a contract of survivorship, because it is a partnership; and, passing that, if a partnership does make such a contract, it amounts to an unenforcible testamentary gift.

I am of opinion that no partnership was created, notwithstanding that the writings at times refer to the relationship as being that. While I agree that there may be a partnership if

there be either express or implied agreement to share losses, it is my view that these writings have no such agreement to share losses. But that aside, I submit that nothing in the law prevents the creating of a joint tenancy, with its incident of survivorship, on part of a partnership. So far as there is a rule on the subject, none are excluded from creating such a tenancy except "bodies politic or corporations." 23 Cyc. 484, Point 3. And there is express authority, both here and elsewhere, that a partnership can do the thing, whatever its name, which cuts off inheritable interest and creates a survivorship. In *McKinnon v. McKinnon*, 56 Fed. 409, it is held that, where an uncle and nephew entered into articles of partnership to practice medicine, a provision in the partnership agreement that, "in the event of the death of the senior member of the firm, * * * all his property, personal and otherwise, which he held in partnership at the time of his death, shall go to the junior partner," should be enforced. One point made in the case was that it was a testamentary disposition without the formalities of a will, and therefore incapable of enforcement in equity. Of necessity, the decision aforesaid overruled this point, and held, moreover, that the ruling could not be affected because the disposition was made in a partnership agreement as to partnership property. This is in harmony with our decisions that there is no unenforcible contract where a disposition agreed upon to take effect after death is not executed as a will should be, if the agreement rests on consideration. Surely, no one will challenge that the disposition made in the writings in this case has a consideration to support it. It seems to me that, in *Stewart v. Todd*, 190 Iowa 283, we have disposed of the entire point contrary to the present conclusion of the majority. In that case, we sustained this contract: The parties "have agreed to start a general store under the firm name [consisting of the name of the wife] in which each party is to be an equal partner." The husband "is to transact and do all the business, sign the firm name * * * to any and all papers necessary; and all the property accumulated, purchased and owned by either party to be in the firm name * * * Both parties to use any money they need, and at the death of either party the one living shall fulfill all contracts, pay all debts, and have all property left or owned by either party, or in the firm name." We

sustain the claim of the husband to survivorship under this contract, and included therein the real estate and, as well, a large amount of personal property.

The matter cannot be better stated than is done in *Wood v. Logue,* 167 Iowa 436, wherein we say:

"Laying aside the question as to what name or designation we shall apply to the transaction between the grantor and grantees, what good reason can be assigned in law or equity for the courts' refusing to give it effect according to its clear intent?"

It is said that the title to property subject to ownership must vest in someone,—an individual, individuals, or a legal entity. To be sure, that is so; but what is it relevant to? especially when it is also said that this property, when it came into existence, vested in these brothers, and that they became vested in these, either as joint tenants or by placing title in a copartnership.

This involves a repetition of the idea that there is a difference as to a partnership.

IV. One of the matters as to which it is difficult to say whether it be merely argument, used as some sort of inducement, or a reason for affirming the decree below, is that part of the majority opinion which asserts, rightly enough, that, as a general proposition, estates in joint tenancy have, in modern times, ceased to be a favorite of the courts. Though true, how is this material, if such tenancies are still recognized in this jurisdiction, and if therein contracts to create them may be specifically enforced in equity? If that be the state of the law in this jurisdiction, what purpose is served by those statements in the opinion which direct attention to the origin and character of joint tenancy; that in its origin it was feudal; that some states have denied the existence of it, except as to real property; that some states have abolished it altogether; and that some require strict proof thereof?

It may be conceded that, in early decisions, among which *Hoffman v. Stigers,* 28 Iowa 302, is one, that something was said to the effect that the estate of joint tenancy is not favored by our law. But when we consider the statute on tenancies, and its construction in cases much later than the *Hoffman* case and like decisions, such language in the early cases can mean no more

than that there is such disfavor of such estate as that the proof thereof must be clear. The statute itself compels that interpretation; for it provides that conveyances to two or more in their own right create a tenancy in common, "unless a contrary intent is expressed." This must mean merely that a tenancy in common is presumed, and that the presumption will not stand if a contrary intent is expressed. We have expressly held that, under this statute, the estate of joint tenancy is permitted to be created, and that the only disfavor it stands in is that its existence must be clearly proved. We so held in *Wood v. Logue,* 167 Iowa 436. In that case, we say further that the qualifying words "unless a contrary intent is expressed" leave a place in the law of the state for a joint tenancy, "with its characteristic incident of survivorship, if the intent of the parties to the instrument to create it is clearly indicated by the language expressed." Here, the agreement overwhelmingly demonstrates that the creation of a joint tenancy was intended. In the *Logue* case, we held that such a tenancy had been created, although the deed standing alone might convey the fee, and though the instrument was not drawn "with technical nicety nor the exactness of a learned, professional conveyancer,"—and this, on language very far from expressing such intent as clearly as the writings before us. About as much as this can be rightly claimed, too, for *Baker v. Syfritt,* 147 Iowa 49, 62.

Nomenclature is, of course, quite immaterial. We so held in *Wood v. Logue,* 167 Iowa 436. For we there held that the thing created, whatever its right name, was a joint tenancy, which cut off inheritable interest and created a survivorship. Will anyone venture to affirm that the writing in the *Logue* case more clearly or even as clearly evinced an intent to cut off the inheritable interest and to create a survivorship? So finding in the *Logue* case rests largely upon deduction and inference,— sound, but still but deduction and inference. In the case before us, the trial court that defeated the defendants also declared that purpose to cut off inheritance and to create a survivorship is clear beyond all doubt. And there is absolutely no room for either deduction or inference. For the provision in both the second and in the alleged controlling third writing, we find this:

"It being the intention of all the parties to this agreement,

and they hereby declare that they, nor any of them have, or can have any property rights or money interest in said business other than that herein specified and defined, so long as any of them shall be associated together in the business of life insurance.'' (2)

All right and interest in renewals and bonuses, no matter in whose name, is to be transferred for the mutual benefit of the signers ''to be used, applied and disposed of in the manner only'' agreed on in the writing. (2)

''It is further agreed that, upon the death or withdrawal of any party hereto, all his interest in said business, and in the assets thereof, shall thereupon cease and determine [without accounting for the past].'' (2)

''Upon the death of either one of the undersigned, the property then owned by the said partnership, including all property standing in the names of the individual partners which embraces said stock in Fleming Brothers, Incorporated, shall be and become the property of the surviving brothers of the said partnership; and that what said decedent has theretofore withdrawn from said partnership shall constitute his sole and entire interest * * * of his estate therein.'' (3)

V. The majority says:

''We are satisfied with the decree of the district court, and its judgment is affirmed.''

But the holding of that court was not based on imperfect testamentary gift; and that court did not hold that the contracts did not clearly express an intention to create an interest that could not be inherited, and which was to go to the survivors. The decree below is bottomed wholly on the conception that the contract is violative of sound public policy. I do not find that the majority places the affirmance upon that ground. And it seems to me it should not have been put on that ground by the trial court. The legislature is the supreme guardian of public policy, and whatsoever it approves *is* sound public policy. The statutes of this state in plain terms permit just what these defendants did. This court has so construed them. What the legislature authorizes to be done cannot be violative of sound public policy.

VI. It is true that, in a sense, each of the signers trans-

ferred things that might otherwise have been held by him severally to all of the signers. But that such assignment is permissible, and merely tends to accrete the fund concerning which survivorship is created, is one of the distinctions between a tenancy in common and a joint tenancy. While, as a fiction of law, each joint tenant holds all the property at all times, and that, ordinarily, there can be no recovery because the joint tenant uses all the property or its usufruct (23 Cyc. 490 B, 491 D) on the other hand, one tenant may maintain assumpsit against the other, to recover his share of the property or its proceeds. *Stone v. Aldrich,* 43 N. H. 52. It follows that the survivorship agreement is not affected by the assignment of anything which the joint tenant owns as an individual, and that, when he conveys his individual property under contract that a survivorship shall be created concerning it, no right of dower attaches. *Maybury v. Brien,* 15 Peters (U. S.) 21. In such cases, he dies seized of nothing; and the majority concedes that the supreme test here is whether the husband of the plaintiff died seized of any of the things in which the plaintiff now claims an interest. As to personal property, the right of disposal is absolute. We have emphasized that in every possible way. See *Langworthy v. Heeb,* 46 Iowa 64; *McDaniel v. Large,* 55 Iowa 312; *Mallory v. Russell,* 71 Iowa 63; *Paige v. Paige,* 71 Iowa 318. We have held that the share of the widow in personal property cannot be enlarged by treating property parted with by the husband as an advancement to children as still part of the personal property of which the husband died seized. *Burgoon v. Whitney,* 121 Iowa 76. The power to dispose of the personalty is absolute (*Lunning v. Lunning,* [Iowa] 168 N. W. 140); and it would not seem to matter with what intent the husband parts with such property. *Metler v. Metler's Admr.,* 19 N. J. Eq. 457.

This has its bearing, too, on the question of public policy. The very fact that the statutes restrain the alienation of real property, while permitting it absolutely as to personal property, shows that disposition of the latter by such an agreement as the one at bar is not against public policy. This answers, too, what the opinion is moved to say upon the fact that the wife is the weaker vessel, who maintains the home and rears the children, and is entitled to have provision made for her by law. Both the

best and the poorest wife is entitled to such provision. But even the best wife is entitled to no more than such provision as the legislature has seen fit to make for her. Conceding everything to the quality of the plaintiff as a wife, that throws no light on whether this contract signed by her husband is or is not enforcible. See dissent in *Younker v. Susong*, 173 Iowa 663, at 689, 690, 696, and dissent of Mr. Justice Marshall in *Hall v. City of Madison*, 128 Wis. 132 (107 N. W. 31, 37).

VII. Speaking by way of summary:

a. We held, in the *Logue* case, 167 Iowa 436, that it is unnecessary to give the arrangement a name; that nomenclature was immaterial. We said:

"Laying aside the question as to what name or designation we shall apply to the transaction between the grantor and grantees, what good reason can be assigned in law or equity for the court's refusing to give it effect according to its clear intent?"

We said, also, that that intent was the granting of a unity of title with right of survivorship; and that the grantor had a right to prefer such an arrangement to "a tenancy in common, with the ordinary incidents to such an estate."

b. In joint tenancy, neither of the successive survivors receives anything by inheritance from the deceased cotenant, and his title is derived solely and directly through the deed which created the tenancy. And the one who dies first does not die seized of any inheritable interest. And the last survivor becomes "the sole and unqualified owner." *Wood v. Logue*, 167 Iowa 436, at 442. And such a contract is sanctioned by Iowa law. It is the essential distinction between an estate in common and a joint tenancy. And in the absence of statute, the survivors take the whole estate, free from any charges on the property made by the deceased cotenant. 23 Cyc. 488, 489.

c. Dower cannot attach to the estate of a joint tenant where, as in this case, his estate remains joint until his death; and this because his estate is not an estate of inheritance. It follows that decedent neither possessed in his lifetime nor died seized of any estate to which a dower interest in plaintiff could attach or inhere. He merely departed from the estate at his death. Code Section 3366; 14 Cyc. 891 to 902.

My understanding is that the majority approves this much. All that it fails to do is to make the approval effective.

d.   A joint tenancy may be created "by any conveyance or act of purchase *inter vivos* which gives an estate to a plurality of persons without adding any restrictive, exclusive, or explanatory words."   23 Cyc. 483 B.

e.   It is not the law that joint tenancies can be created as to land only, nor that they cannot be created by a partnership as to partnership property, either personal or real.   In *McKinnon v. McKinnon,* (C. C. A.) 56 Fed. 409, it is held that inheritable interest may be destroyed and a survivorship created in all property, "personal and otherwise," held in partnership when the senior partner dies.   And that is the holding of *Stewart v. Todd.*

f.   It is not the law that a contract like the one at bar fails for being a testamentary gift; for, though not executed with the formalities of a will, it is saved because it rests on consideration.   *Stewart v. Todd.*

g.   Speaking to the rule generally, I find a pronouncement in 23 Cyc. 483 A that "a joint tenancy exists where a single estate in property, real or personal, is owned by two or more persons, other than husband and wife, under one instrument or act of the parties."

h.   There is no difficulty about construction here.   The writings either clearly create the tenancy, or they do not.   The whole test whether they do create one is to be solved by an inquiry as to whether four elements co-exist, to wit:   (1)   Unity of interest;  (2) unity of title;  (3) unity of time, except as modified by the statute against perpetuity;  (4) unity of possession. That is to say, each owner must have one and the same interest, conveyed by the same act or instrument, to vest at one and the same time, and each must have the entire possession of every item of property held in joint tenancy, as well as the whole.   23 Cyc. 484, 485.   It follows that, as to estates held in joint tenancy, no right of dower will attach.   *Mayburry v. Brien,* 15 Peters (U. S.) 21; Park on Dower 37; 1 Scribner on Dower (2d Ed.) 269; 4 Kent's Commentaries 37.

SUPPLEMENTAL OPINION ON REHEARING, DECEMBER 20, 1920.

EVANS, J.—I. The justices concurring in the majority opinion heretofore filed are still satisfied that the case was properly decided. Because of some features of the argument in support of the petition for rehearing, we are disposed to add to the former opinion this further word of discussion. The facts are sufficiently stated in the original opinion, and we shall not repeat them here.

5. WILLS: agreement to make subservient to widow's share.

We adhere to the view that the theory of joint tenancy, in a common-law sense, is not available to carry the appellants any further than the terms of their contract carry them. If this contract by its own terms was effective to divest each of the contracting parties of his estate, and to transfer the same to the survivor of them, then it were needless to say that a joint tenancy was or was not created. If, on the other hand, the contract by its own terms was not effective to that end, then it was not effective to create a joint tenancy, in the common-law sense. If the contract had purported in terms to create a common-law joint tenancy, a somewhat different argument would obtain at this point. It did not do so. On the contrary, it purported in terms to create a partnership. In determining the effect of the contract, therefore, we cannot add to its terms the legal fiction involved in a common-law joint tenancy. To do so would be to assume a joint tenancy as a major premise, in order to prove it as a conclusion.

To put it in another way, the typical case of joint tenancy is ordinarily created by grant of a third party. It involves no necessary contractual relation between the joint tenants. In this case, the alleged joint tenancy was not created by act of any third party. It was created, if at all, solely by the contract of the alleged joint tenants. Assuming, for the purpose of this discussion, that a joint tenancy may be thus created, it would be, nevertheless, a status created by the *contract* of the parties, and not otherwise. Whatever the rights thus created, they must be determined in obedience to the contract, and to nothing else. In the last analysis, therefore, we have before us a *contract;* nothing more, nothing less. Being a contract, it may be enforced as such, unless there be some legal impediment thereto.

Looking at this contract, what is its general nature or classification? Is it testamentary? Is it the equivalent of a contract to make a will? Is it a sale contract? Does it transfer property from one party to another? Does it

6. CORPORATIONS: ineffectual transfer.

obliterate the beneficial right and equitable title of any or all of the parties to the property which is the subject-matter thereof, and which, in the absence of contract, would be owned in common by all? Notwithstanding the contract, did the parties thereto still remain the beneficial owners of the property involved? Manifestly, no party to the contract could thereby be divested of his beneficial interest in the property, except by the transfer of the same to some other party. By a series of instruments, the four parties conveyed their legal title to a corporation organized by themselves as exclusive stockholders. Each received his pro-rata number of shares of stock. Thereupon, each purported to transfer his shares by indorsement and delivery. To whom did he indorse, and to whom did he deliver? There was no transferee, and no taker of delivery. They all put their shares into a common receptacle, and locked them in the safe, to await eventualities. The property still remained in the dominion of the same parties. Its benefits still accrued to them. No fifth party had acquired any interest in or incumbrance thereon. The property rights of the four parties respectively, whether legal or equitable, were mutual and exactly equal. If they had then attempted a partition, as between themselves, each must have received his one fourth thereof. In some respects, the contract on its face attempted the impossible. It attempted to dispose of the respective interests of the partners, and yet to retain the same; to do, and yet not to do; to give, and yet to withhold. In the nature of the case, such contradictions are not enforcible. The net result is that the equitable and beneficial ownership of the joint property thus manipulated *remained*, and that the equitable or beneficial interest thus remaining to each party to the contract was an *estate*, within the meaning of the law, and was descendible as such, in accord with the statute, subject only to the incumbrance created by the contract itself. The contract in question was, therefore, analogous to and fairly equivalent to a contract to make a will, and only in that character can it be

given effect. It was not effective to pass a present estate in any particular property, nor did it operate as an incumbrance upon particular property during the lifetime of decedent, whether owned jointly or in severalty. Its obligations were necessarily suspended as to each partner during his life. It became enforcible as an incumbrance, if at all, against his *estate,—after* his death, and not *before*.

The result is that the decedent *left* an *estate;* and the contract must be deemed to operate as a claim or incumbrance upon it, either in part or in its entirety, in the same manner as a contract to make a will. Though, therefore, the contract be deemed enforcible as one to make a will, the question remains, Is it effective as against the *widow* of the decedent?

If, in the absence of a contract, the deceased partner had made a will disposing of his property to his brothers in the manner described by this contract, doubtless it would not be claimed that such will could be effective as against the widow.

Code Section 3376 provides:

"The survivor's share cannot be affected by any will of the spouse, unless consent thereto is given," etc.

We have held that this section of the statute is applicable to personal property, as well as to real estate. *Ward v. Wolf*, 56 Iowa 465; *Linton v. Crosby*, 61 Iowa 401; *May v. Jones*, 87 Iowa 188. See, also, Code Section 3362. The statute, therefore, is an impediment to the operation of the husband's will upon his estate in such a way as to deprive the widow of her distributive share of either the personalty or the realty.

The question still remains whether the fact that the husband during life *contracted* to make such a will, will avoid the operation of Section 3376. May the wife assert the impediment of the statute against the operation of such *contract?* If the statute disabled the husband from making a will detrimental to the wife, could the husband, nevertheless, make a valid *contract* obligating him to make such will?. Doubtless it were more accurate to say, not that the husband was *disabled* from making the will, but that the operation and effect of his will would, under the statute, be subject to the consent of the widow, so far as her distributive share was concerned. A contract to make a will would be fully performed by the making of the will. Would

the operation and effect of such will be subject to the provisions of Section 3376? We answer, yea. Though in this case no will was, in fact, made, the contract could, nevertheless, be enforced to the same extent as though the will had been made, and not otherwise. The enforcement of the contract is subject to the limitations of the statute, because the will itself would be subject thereto.

We are not unmindful that, during the lifetime of the decedent, there was no legal impediment to his disposing of his personal property. He could have sold it: he did not sell it. He could have transferred it, perhaps, even without consideration: he did not transfer it. There was no transferee. At this point, we are not concerned with forms. We look to the substance of the property rights of this decedent. Though in form he transferred all his property to the corporation, he was the joint creator of the corporation,—an owner of one fourth thereof. Though *each* of the four parties transferred his stock in severalty to *all* of them jointly, and thereby changed the form of his property right, he still owned the substance thereof. This is not saying that the contract was void and of no effect as against the decedent's estate. It is only saying that it is not effective to defeat the widow's right to her distributive share.

Construing and applying the statute broadly (Sections 3362, 3376) to the purpose of its enactment, it leaves no opening for ingenuity to enable a husband to remain during life in full dominion of his property, and yet to dispose of the same after death to the exclusion of the widow from her distributive share.

Personal property, it is true, would be subject to the good-faith indebtedness of the husband; but, as against the widow, it would not be subject to a mere scheme to absorb it. This does not imply that these brothers had a conscious purpose to wrong any surviving widow. Doubtless their only active purpose was to create the enterprise and to draw upon it for the care of all who were dependent upon them, either severally or jointly. Though the contract imposed upon them no obligation in respect to any surviving widow, the surviving partners do recognize an obligation, either moral or legal, to care for the plaintiff as such surviving widow, and they offer to provide her generous support. But the specific motive is not controlling. The right of a widow

to her share of the estate, whether legal or equitable, owned by her husband at the time of his death, is impregnable; or it is not existent at all. This right does not arise out of any contract. Nor can she be required to accept generosity, however princely, in lieu of it.

II. In our foregoing discussion, we have assumed that the mutual promises were a sufficient consideration to support the contract as between the parties. It must be noted, however, that these mutual promises all carried the same in-

7. CONTRACTS: legal and illegal mutual promises.

firmity. Each and all were assailable upon the same ground, as for failure, or partial failure, in that more was promised than could be performed. If this decedent had survived his brothers, and had sought to enforce their promises, he would have encountered the same impediment as they have encountered here. So that the performance permitted here is as full as the consideration is valid. By their very nature, the mutual promises were exactly equal in value, as mutual considerations. Between performance and consideration, therefore, there is complete mutuality, in that the one is the full measure of the other.

Performance is partial because the validity of the promised consideration was only partial. The partial failure of consideration would be a just ground of offset against full performance. No legal damage accrued, therefore, even as against the decedent or his estate. In assuming the validity of the consideration of the contract, therefore, we do so with this qualification.

This opinion is supplemental to the original opinion, and is not a substitute therefor. One reason therefor is the vigorous attack made upon the original opinion, as being in conflict with *Stewart v. Todd*, 190 Iowa 283. The opinion in the latter case and the original opinion herein were both written by the late Justice Gaynor. No reference was made in the original opinion herein to the *Stewart* case. An examination of that case will readily show how little occasion there was that such reference should be made. The contract in that case was one between husband and wife, and its enforcement was sought and obtained by the surviving husband, as against the collateral heirs of his wife. The question whether a contract for his entire estate after death, between the deceased spouse as grantor and a third

party, is subject and inferior to the statutory right of the wife or husband, was in no manner involved therein. Such *is* the controlling question in this case. We find no conflict in the two opinions. The petition for rehearing is overruled.

SALINGER, J. (dissenting.)   I.   The majority declares:

"The justices concurring in the majority opinion heretofore filed are still satisfied that the case was properly decided. Because of some features of the argument in support of the petition for rehearing, we are disposed to add to the former opinion this further word of discussion."

Even if one note but part of the well made attacks upon said opinion, he will find that counsel have not misconceived it, and that it should not have the foregoing approval.

a. That opinion urges against the contract defendants have, that it deals with *personal property owned by a partnership*. Such holding is bad law, and conflicts with our own and other decisions. In *Stewart v. Todd*, 190 Iowa 283, we sustain such a *contract, though its subject is confessedly partnership property*, including personal property. In *McKinnon v. McKinnon*, (C. C. A.) 56 Fed. 409, the contract enforced *deals with nothing but the personal property of a partnership*. While *Baker v. Syfritt*, 147 Iowa 49, involves no partnership, it does uphold a *survivorship agreement that deals with property both personal and real*. And see *Smith v. Douglas County*, (C. C. A.) 254 Fed. 244.

b. One argument of the opinion is that a "commercial enterprise" cannot "be affected by a joint tenancy." This is irrelevant and fallacious, because the contract gives rights, even if it were true that such enterprise may not so be affected, and because this contract deals, not with a commercial enterprise, but with future accumulations of that enterprise. As well say that money received from land is not personal property because the source is real property.

c. It not only "construes" what needs no interpretation, but it erroneously interprets plain words away. The contract says repeatedly that each signer and his estate shall, unless he be the last survivor, have no interest in or rights to the partnership property, "except such share * * * as shall be actually re-

ceived by each or shall be paid upon the order of each with the consent of the others from the general funds or income of said business.'' The opinion declares that this is not a limitation upon inheritable rights, but merely a provision to guard against extravagance. This not only disregards the plain words of the contract, but is against reason. In such a contract as this, the share of any who die first is necessarily limited to what he has drawn in his lifetime. If all that belongs to him passes to another on his death, all he can have is what he has already obtained. He can add nothing to his estate after he has died.

d. There should be no approval of the pronouncement that ''estates in joint tenancy have in modern times ceased to be in favor with the courts.'' The statute sanctions such tenancies. See *Wood v. Logue,* 167 Iowa 436. At mildest, this is a declaration that the law of the land may be disfavored by the courts.

II. The ''supplemental'' opinion must be tested by itself. It neither supports nor is it supported by the original opinion. The ''supplemental'' opinion is neither a supplement nor a ''further word of discussion.'' The original does not touch what the supplemental one advances.

The majority says:

''In the last analysis, therefore, we have before us a *contract;* nothing more, nothing less. Being a contract, it may be enforced as such, unless there be some legal impediment thereto.''

And then elaborates matter utterly irrelevant to the issue so stated. This shows that the only material question has been forgotten for the time being, and it tends to explain why the true issue seems not to have been determined at all.

What does it matter that, ''in determining the effect of the contract, we cannot add to its terms the legal fiction involved in a common-law joint tenancy,'' or that ''the alleged joint tenancy was not created by act of any third party,'' but ''was created, if at all, solely by the contract of the alleged joint tenants;'' or that the contract does not purport ''in terms to create a common-law joint tenancy?'' Surely, it cannot matter ''that the theory of joint tenancy, in a common-law sense, is not available to carry the appellants any further than the terms of their contract carry them.'' If they are entitled to relief to the extent to which ''the terms of their contract carry them,''

it cannot matter how many things exist which give them no relief.

In a word, here is no question of names. No dictionary can rightly decide this suit. Rights ought not to be denied because there is a quarrel over the name of the rights, nor because immaterial things may or may not be done. As said in *Wood v. Logue,* 167 Iowa 436:

"Laying aside the question as to what name or designation we shall apply to the transaction between the grantor and grantees, what good reason can be assigned in law or equity for the court's refusing to give it effect, according to its clear intent?"

And see Rood on Wills, Section 53.

III. It is stressed that the four signers created a corporation, with themselves as sole shareholders, each receiving his pro rata in shares, and that thereupon each purported to transfer his shares by indorsement and delivery. The preface of the court is: "We are not concerned with forms. We look to the substance of the property rights of this decedent." But is that done?

The plaintiff declares over and again that this corporation and these shares were and remained the property of the partnership, and her husband died seized "of an undivided interest in all the property of the partnership, which partnership property includes all the capital stock and property" of said corporation. So then, creating the corporation and so issuing and dealing with the shares is nothing but a change of form. It should not be seriously contended by those who profess to disregard mere change in form that anything material was effected. If four partners conclude to symbolize hardware owned by the partnership by stock certificates issued to the partners, the rights of each in the hardware remain unchanged. The share certificate represents the hardware. I agree with the majority that:

"The property still remained in the dominion of the same parties. Its benefits still accrued to them. No fifth party had acquired any interest in or incumbrance thereon. * * * If they had then attempted a partition as between themselves, each must have received his one fourth thereof."

But I cannot follow it in forgetting the effect of its statement. That effect is that the mere creating of the corporation

and issuing said stock has no bearing at all upon the contract rights of the parties.

As to the inquiry, "to whom did he indorse and to whom did he deliver," and the statement "there was no transferee and no taker of delivery,—they all put their shares into a common receptacle, and locked them in the safe to await eventualities," I have to say I shall later attempt to show that all this is immaterial. It foreshadows a position more fully developed by the majority elsewhere, and is indicative of the thought that there was no delivery of the stock shares. It may well be said that these shares were in the possession of all four of the contracting parties as long as they lived, and on the death of one, these continued in the possession of the survivors; and that the deposit of the stock nominally in the deceased member, and the assigning by him in blank, amounted to a constructive delivery by him at the time he executed such assignment. But I need not pursue this now. The most the argument of the majority comes to is that the creation and assigning of the shares effect nothing, because delivery was lacking. If that be granted, then the issuance and attempted transfer of the shares comes to nothing. The net result in law is that each partner retained the same interest in the partnership property as if no corporation had been created by the partnership and nothing whatever had been done by the corporation. In no view was more change effected in partnership rights than if the partnership had retired from business and put all the accumulations therefrom into government bonds. All that would accomplish is that a share in business accumulations would become a share in government bonds.

IV. But, as already indicated, lack of delivery, the retention of joint possession, and the preserving equal access to each partner are amplified in another branch of the argument of the majority. The sum of that argument is that somehow this suit is affected by lack of disseizin of one contracting party, and by failure to deliver to and vest in the other party, and that there is fatal uncertainty as to where title is lodged. It is an argument that has made much bad law, on so-called ·contingent remainders. Can it be possible that a contract of survivorship wherein several agree that the one last remaining alive shall have all the property of the others is in any way affected by

delivery, disseizin, and vestiture? If that be so, it is inexplicable why a survivorship contract was ever upheld. For in each and all the cases of such contracting, no party was disseized, no party was vested with title to what he did not already own, and neither party delivered anything to the other except the contract itself. In each and all of such cases, each contracting party kept full control of and access to the individual property of his that had been made the subject of the contract. In each of them, it could have been said, "there was no transferee and no taker of delivery." And what an absurdity it would be to require mutual delivery in such cases. A owns 10 horses; B also owns 10. Can they make no effective agreement that the survivor shall have all that remain of the 20 unless, when the parties sign, each delivers his 10 horses to the other? To follow that to its end, the moment the exchange was made, it would seem to become necessary to keep on transferring and retransferring. Must one who puts his farm into a survivorship contract deliver his farm at the time when he executes the contract? In the supposed case of the contract where each party has 10 horses, will it invalidate the contract because both parties had free access to both sets of horses, and, for that matter, if they both have control of both sets? In the *Stewart* general store case, not an item of the stock was ever delivered into the sole control or possession of either party to the partnership contract. Every item was at all times as much under the control and in the possession of one partner as of the other. There was never a moment when one party did not have equally full access to everything belonging to the partnership. The benefits of the existence of the general store "still accrued" to both contracting parties. It was true there, too, that no party other than the ones contracting "had acquired any interest or incumbrance thereon." There, as here, if the parties had attempted partition as between themselves, "each must have received his one fourth (½) thereof." It is true that, in all cases of contract of survivorship, that (in the sense the words are used by the majority) "they all put their shares in a common receptacle and locked them in the safe to await eventualities." That is to say, in the *Stewart* case, the joint property was kept in the common receptacle, the partnership store, and kept there even as things

are kept in a safe, to await the eventuality, the death of one partner, on the happening of which the property would be removed from the common receptacle where it was constructively locked up, and be given to the survivor. In the *Stewart* and in all like cases, just as here, the property "still remained in the dominion of the same parties." It was true there, as here, in the sense that the majority uses the words here, that "there was no transferee and no taker of delivery." As said, no survivorship contract should ever have been upheld if here is the true theory, because not one could meet the test now formulated. Their very essence is that benefits and dominion shall be temporarily retained, with access and control, and that the final vesting of title must wait the happening of the contracted-for eventuality. There is inchoate title in all the parties, subject to the contract limitation that the last survivor shall have sole title.

V. It is not unknown in the law that title vests, even though full use and enjoyment be postponed, and even though it may not, at the instant when title is said to vest, be known with definiteness who will *ultimately* have full title. Here, there was an agreement that the survivor should have "the property then owned by the said partnership, which should be and become the property of the survivor member of the said partnership." I think it is not straining to say that, if vesting and divesting were material, each partner was so divested and each other so invested as that the title remained inchoate in the four until three had died, and that then full title vested in that survivor. We held in *Wood v. Logue,* 167 Iowa 436, that the last survivor becomes the sole and unqualified owner. Let me repeat that, if divesting and vesting be essential, there was the same flaw in every case wherein survivorship contracts have been upheld.

In *Allbright v. Hannah,* 103 Iowa 98, at 102, the contract was that the plaintiff should have certain lands upon the death of one Remey, or when Remey and his wife were done with it, and we said that this "was either the present transfer of the fee, subject to a life estate, or an agreement to will the property to the plaintiff;" and that, "whichever it may have been, it was good if plaintiff accepted it and acted thereon, and took possession of the land thereunder." This may not fit the present discussion with absolute exactness, but it does settle that, for the

purposes of sustaining survivorship contracts, that may be deemed a present transfer of the fee which for some purposes is not deemed to be such transfer.

Recurring to the uncertainty as to who will be the ultimate owner or beneficiary, that difficulty, too, was present in the cases wherein contracts such as this have been held to be valid. In *Wood v. Logue,* and in *Stewart v. Todd,* it was as uncertain who would get full title by becoming the last survivor as it was uncertain, when the contract at bar was signed, which of the four brothers would live the longest.

On the reasoning of the majority, what this court has held as to contingent remainders is bad law, and there is no defending such decisions as that in *Woodard v. Woodard,* 184 Iowa 1178, and the numerous decisions therein cited in support. In that case, it was contended that, when the will was executed, it could not be known what greatgrandchildren would be in being when the time for ultimate transfer and vesting arrived, and that, therefore, the remainder was a contingent one. We answered that, when said will was executed, named greatgrandchildren were in being, with present capacity to take; that, therefore, though it could not then be known that any of these greatgrandchildren would be living when the life estate in the grandchildren lapsed, or that later born ones would not then be *in esse,* yet the remainder was vested; and we said that, "unless something not yet discussed avoids it, the greatgrandchildren took title on the day the testator died." The effect is that there was a vesting in the class known as greatgrandchildren, though no one could tell who, if anyone, would be in the class when the time for distribution came. On this line of decisions, it follows title was sufficiently vested in each of the brothers, because it was agreed that one of the four in their class should at some time have full title; and the fact that it could not then be known which one in the class would be such ultimate beneficiary, does not prevent a sufficient vesting of title in the class.

VI. I take it, on the authority of *Stewart v. Todd,* that, assuming the contract here to be on sufficient consideration, it would be enforced against heirs. If, then, it is not enforcible, it must be because the wife of a party to this contract is attacking it. I have already attempted to show that, when Charles

died, his interest in the partnership property was incumbered, or perhaps it is more accurate to say, he had parted with it conditionally, to wit, on the condition that it should go to the last survivor. If that be sound, his wife took no more than an heir could, because there was nothing for either to take. On that reasoning, the case would stand precisely as if the husband, in his lifetime, had, for a sufficient consideration, made a conditional sale of his property, with delivery to be made when he died; or as if, though he died seized of it, it was mortgaged to its full value. It is manifest that, in such case, the widow could take nothing. It seems to me the whole controversy at this point is disposed of by the single pronouncement in *Mayburry v. Brien,* 15 Peters (U. S.) 21, wherein the Supreme Court of the United States ruled that "the mere possibility of the estate being defeated by survivorship prevents dower" from attaching. I repeat that, if the contender were other than the wife, no one would pretend to say that this contract is not enforcible, and I add it is immaterial that the wife is attacking, because the act of her husband in his lifetime worked that no marital rights attached to the property in question at the time when the husband died; that he died seized of nothing.

Since it must be conceded that decedent in his lifetime had the right to give his property away, or to sell it for any price that pleased him (*Lunning v. Lunning,* [Iowa] 168 N. W. 140; *Metler v. Metler's Admr.,* 19 N. J. Eq. 457), it would seem that the death of the seller could not deprive a purchaser from him of property sold to him, to be delivered after death, merely because decedent had been more provident than is one who throws his property away or parts with it for an insufficient price. One can contract as to what shall be done after he die. *McKinnon v. McKinnon,* (C. C. A.) 56 Fed. 409; *In re Estate of Neil,* 35 Misc. Rep. (N. Y.) 254; and Page on Contracts, Section 397. If there be the right to sell if he yield possession, the sale must surely be as effective where, in addition to the purchase price, he demands and obtains the additional privilege of using the property without cost to himself until he shall die. If, had he not exacted this additional benefit, the property was lost to his wife, how can it be retained for her because he obtained an enlargement of the price by the retention of possession?

VII. This brings me to the major argument now made by the court. It rests upon a perfectly sound premise, to wit: that the husband may not by will cut off the distributive share of the wife. The unsound deduction from this sound premise is that the defendants stand as if they were seeking to assert a will against the distributive share of the plaintiff. The argument is this: (a) This is a contract to make a will, which has been breached. (b) Whensoever such an agreement is made and broken, the remedy of the party not in fault is that he is to be treated as if the will agreed to be made had been made, and he must be dealt with as one basing his rights upon a duly executed testament. I answer, first, that, whatever may result where a contract to make a will *is* made, that is immaterial where no such contract was made; and that here there is no thought of making an agreement to make a will, and no such contract was made. And whatever may result from the making and breaking of a contract to will, it does not result here, because the contract here is the permissible agreement that the future rights of the parties shall be based on the fact of survivorship (17 Am. & Eng. Encyc. of Law 650); was a lawful stipulation as to what should, at the death of all but one, be done with the accumulations the parties were then engaged in creating. Said text states, on the authority of *Taylor v. Smith,* 116 N. C. 531, *Pritchard v. Walker,* 22 Ill. App. 286, and *Jones v. Cable,* 114 Pa. St. 586, that the fact that survivorship is no longer regarded as an incident of joint tenancy does not invalidate contracts which definitely provide that future rights of contracting parties shall be based on the fact of survivorship; and that, "although the right [of survivorship] as an incident to such tenancies be abolished by statute, it may nevertheless be given by will or deed, either expressly or by necessary implication. Nor does such a statute prohibit contracts making the rights of the parties dependent upon survivorship."

VIII. But assume that here is a broken contract to make a will, does it follow therefrom that this creates a will, and that, therefore, these defendants are in the position of seeking to deprive the distributive share of a widow by what amounts to an attempt to take it from her by will? That can be true only if, on breach of a contract to will, a will results. Such a con-

tract, though broken, remains just a contract, and the remedy on breach is a complaint of the breach, with demand for damages, *quantum meruit,* or other remedies allowed for breach of contract. *Hammerstein v. Thomson,* Clark & F. 245; *Henry v. Rowell,* 31 Misc. Rep. (N. Y.) 384; *Leahy v. Campbell,* 70 App. Div. (N. Y.) 127; *Furman v. Craine,* 18 Cal. App. 41; and 1 Schouler on Wills (5th Ed.) Sections 452, 453, 454; *Allbright v. Hannah,* 103 Iowa 98, 101. Or the remedy may, in some cases, be recovery of the value of what claimant has given for the premise (*Frost v. Tarr,* 53 Ind. 390; *Shakespeare v. Markham,* 10 Hun [N. Y.] 311); or *quantum meruit* (*Taylor v. Wood,* 4 Lea [Tenn.] 504, at 510; *Jincey v. Winfield's Admr.,* 9 Gratt. [Va.] 708; 1 Beach on Contracts 786; 2 Elliott on Contracts 454, Note 20). Both as to substance and remedy, such a contract is but a contract,—never a substitute for a "will." 3 Elliott on Contracts 218, 797; 1 Beach on Contracts 487; Bishop on Contracts (1st Ed.) 516, 518; Page on Contracts 2466.

"There is nothing peculiar about contracts to make provisions by will. An actual contract must be shown. The parties must have been competent. Their minds must have met on a certain and definite agreement, unless the facts imply a promise which would sustain an action on *quantum meruit.*" Rood on Wills, Section 54.

The inquiry of the majority whether the agreement here be "the equivalent of a contract to make a will" is, then, an immaterial inquiry. For, if it be conceded to be such contract, and to have been breached, not a step is taken towards putting these defendants in the position of one who is basing his rights upon a testament. As said in *Stewart v. Todd,* 190 Iowa 283, where it is true that the writing cannot be enforced as a testamentary instrument, it may, if on consideration, be enforced as a valid and binding contract. To the same effect is *Baker v. Syfritt,* 147 Iowa 49, 55. This means that a will can be a contract, too. But though a will may sometimes be dealt with as a contract, and though a deed or other paper executed as a will may be a testament, even if not in the usual form of wills, it has never been held that a contract to make a will, or any other contract which is not executed with statute formality, can be substituted for a will, or be treated as being a will, either for

the purpose of attack or of defense. The court may not manufacture a testament and thrust it upon a litigant, and thereupon deny him rights upon the ground that he has no rights, were he basing them upon a will. No writing which lacks the statute attestation is a will for any purpose. An attempted will which fails to be that, because not executed as required by statute, may be evidence to establish the existence of a contract to give, but is not and cannot be a testament. It ever remains a contract only. *Studer v. Seyer,* 69 Ga. 125; *Walpole v. Orford,* 5 Vesey Ch. Rep. 402. That is so true that it has been held that contracts to make a will are not entitled to probate, because "contracts cannot be probated." Rood on Wills, Section 51-a. And the courts have gone so far as to deny probate to instruments that were wills, because they were executed in pursuance of a contract such as made the will irrevocable. Sir John Nicholl said: This very irrevocability "destroys its very essence as a will, and converts it into a contract, a species of instrument over which this court has no jurisdiction." And see Rood on Wills, Section 52; and *Hobson v. Blackburn,* 1 Addams 274, 275; *Schumaker v. Schmidt,* 44 Ala. 454; and *Eggers v. Anderson,* 63 N. J. Eq. 264 (49 Atl. 578).

Because of this very remarkable pronouncement by the majority, this point, that here there is no will, cannot be overemphasized.

IX. Availing itself of the statement that, up to a certain point, sufficient consideration has been merely assumed, the majority finally declares that there is something defective in the consideration.

It is not denied that mutual promises may be a sufficient consideration. It cannot be denied that here there were mutual promises. For the contract recites that the consideration is "the service of each of us rendered in the business of life insurance or of the income to be derived therefrom and of mutual stipulations herein contained." It is not denied that such a writing imports a consideration. It cannot be denied that such service was rendered. What is intended is a claim that the contract is injuriously affected because complete performance of part of the mutual undertakings is impossible. It is said:

"In some respects, the contract on its face attempted the

impossible. It attempted to dispose of the respective interests of the partners, and yet to retain the same; to do and yet not to do; to give and yet to withhold. In the nature of the case, such contradictions are not enforcible.''

I have said all I can about the alleged impossibility of performance. That assertion of impossibility is but a repetition of the assertion that no contract can work to deny this widow a distributive share, and that no attempt has been made to do so, except to assert a will. If these be not sound positions, there is no impossibility.

## 9-a

Upon the alleged impossibility rests a claim of partial failure of consideration. There is no such issue in the case. It is true the petition alleges that ''said contracts are null and void, for the reason that they are without consideration and contrary to public policy,'' and ''as a transfer of property are without consideration, and colorable only.'' This is a plea that the contracts are *nudum pactum;* that there is *no* consideration. Such a plea does not raise failure of consideration, or impossibility to give the full consideration. Such failure and part failure are matters which, under Section 3629 of the Code, must be ''specially pleaded.'' It is said, in 13 Corpus Juris 741:

''A plea of partial failure of consideration in an action on a sealed instrument reciting a consideration is bad. And at common law partial failure of consideration could not be set up as a defense, unless the transaction was fraudulent in its inception; defendant was obliged to resort to a cross-action to recover his damages, unless he could show an entire failure of consideration.''

While it is true the same text declares that now, either by statute or judicial determination, it is generally permitted to interpose the defense of a partial want of consideration, or of failure of consideration in the action on the contract (thus preventing circuity of action), of course that does not say that a denial of all consideration in a written instrument which imports a consideration is a good plea to raise a partial lack of or a failure of consideration. The text referred to makes that

plain by the statement that, while such defenses may now be interposed, that is so only "when the facts constituting the defense are specially pleaded or set out by way of recoupment or as a bar to so much of the demand as may be thus answered." And I think that *Mueller v. Batcheler*, 131 Iowa 650, as analyzed in *Stewart v. Todd*, holds that this contract was fully supported by lawful consideration. At least it is a decision that the mutual promise creating the survivorship will support the contract.

X. I concede freely it may not be as clear to others as it is to me that the decision here is an absolute impairment of the right of contract. But I do think that all minds might agree that it is at least a most serious question whether there has not been such impairment. It would seem that the least that could be done by the majority would be to give some recognition that such a Federal question exists, to the end that, if the view now prevailing be here adhered to, an opportunity be given to have the Supreme Court of the United States consider this case.

XI. One of the things claimed by the plaintiff as partnership property is the proceeds of insurance policies, in $58,000. I am utterly unable to see why she should be permitted to prevail as to this, no matter what is done about the general contract. This insurance was effected upon the lives of each of the four contracting parties, by policies in terms made payable to the other three brothers, or survivor of them. The insurer is liable to no one but the beneficiaries thus specifically named. The widow of the deceased can have no possible claim against the insurer. There is no contractual relation between them. As said, I cannot conceive on what theory she is permitted to share in the proceeds of this insurance, which, in any view, is the property of someone other than herself,—is an obligation that can rightfully be paid only to others than herself.

XII. I have to say further, the evidence in this record demonstrates positively and unequivocally that the widow knew of and acquiesced in and profited by the joint arrangement evidenced by these contracts, and for many years. In my opinion, she should be held to be bound by an estoppel, as was the widow in the *Allbright* case, 103 Iowa 98, where there was less foundation for the estoppel than there is here.

One may grant, for the sake of argument, that this widow should not have been placed by her late husband in the position I find her in, and that judges, as men, may properly entertain a desire that she should have a distributive share in this property. But the judges should bow to the law as they find it, even if it results that what is desirable and abstractedly equitable may not be accomplished.

I would reverse.

### SUPPLEMENTAL OPINION ON FURTHER REHEARING, SEPTEMBER 28, 1921.

EVANS, C. J.—I. It is to be conceded that our former opinions are incomplete in their discussion, in that the item of "life insurance" is not considered therein. It is a matter of some doubt whether the pleadings make any issue as to such item. The only reference thereto in the petition of plaintiff is contained in Paragraphs 6 and 11. Paragraph 6 was as follows:

8. DOWER: insurance payable to surviving partner.

"That plaintiff's deceased husband carried life insurance in the amount of $58,000."

Paragraph 11 averred that the three defendants had collected such life insurance and appropriated the same to their own use. It was not alleged that the plaintiff was the beneficiary of the policy; nor was any other fact pleaded as a basis for the claim that the insurance proceeds belonged to her, either in whole or in part. The trial court filed a lengthy written opinion in the case, comprising apparently a complete discussion of all points presented for his consideration. No reference is made therein to the item of insurance. The opening argument of plaintiff, as appellee, purports to be a full discussion of the case; but no reference is contained therein to the insurance. However, the decree entered by the trial court did in terms declare the insurance proceeds to be a part of the partnership property. The implication from such finding would naturally be that the plaintiff was entitled to recover the one-eighth part thereof. The only disclosure of the detailed facts pertaining to such insurance is to be found in the answer of the defendants, appellants here, and in the evidence in their behalf. It is to be said

also that the appellants made proper point in their opening argument here, calling in question that feature of the decree entered below. It is true that the basis of their claim of right to such proceeds which was put forth by them with greatest emphasis was the contract which we have already considered in our former opinions, and which we hold to be ineffective as a bar to the widow. But they did base their claim of right also upon other grounds, which we here consider. If the item had not been specified in terms in the decree, we should be inclined to hold that it was not within any material issue tendered by the petition. Inasmuch as the decree did specifically purport to adjudicate it, the appellants are entitled to demand our consideration of it in a specific sense.

The undisputed facts, as they appear from the pleadings and the evidence of the defendants, are that the "life insurance" in question was payable to the three brothers, appellants herein. It appears that similar insurance was carried upon the life of each member of the firm in favor of the other three members thereof. The undertaking of the insuring company was to pay the death loss upon any life to the other three members of the firm. Such form of insurance was legitimate. Each member of the firm had an insurable interest in the life of every other. The expense of the insurance was borne by the beneficiaries. It appears also that the insuring company held all these policies as security for loans negotiated to the firm. The method of collection of these policies upon the life of decedent was that the insuring company applied the full proceeds as a credit upon the indebtedness owed to it by the firm and the members thereof. It is manifest, therefore, that, upon the face of the insurance contract, the three defendants had the legal right to the proceeds of the "death loss." They and they only could have maintained an action therefor against the insurance company. If there be facts *aliunde* which would equitably impress a trust, nevertheless, upon these proceeds in the hands of these defendants, it was incumbent upon the plaintiff to plead and to prove such facts. Nothing of that kind was attempted by her. The manifest objective of her petition was to obtain an adjudication that the contract under attack was ineffective to bar her right of distributive share. The emphasis of the litigation was concen-

trated upon that proposition. We have sustained the contention of the plaintiff in that regard. But even so, such contract has no effect whatever upon the question of the defendants' right to the insurance proceeds. They do not take such proceeds under and by virtue of the contract under attack; neither are they forbidden to take the same thereby. They take such proceeds under and by virtue of the insurance contract, and of that alone. Their right thereto is neither greater nor less by reason of the contract of alleged joint tenancy.

We reach the conclusion, therefore, that the item of "life insurance" proceeds should be eliminated from plaintiff's recovery, and that the decree entered below should be modified to that extent. In all other respects, the petition for rehearing is overruled.

II. The appellants urge upon us very earnestly that the effect of our holding here is to overrule prior decisions, and therefore to deprive appellants of their property without due process of law, in alleged violation of the Constitution of the United States. The premise upon which such plea of unconstitutionality is based, is negatived by the opinion complained of. It does not purport to overrule prior decisions. Appellants' contention to such effect is argumentative only, and is not sustained by us. Moreover, if the premise were conceded, and if it were deemed correct to say that the overruling of a prior decision by an appellate court of a state is a violation of the Constitution of the United States, such point would have been just as available to the appellants in their original argument as in their petition for rehearing. No such point was therein made.

We are asked to recognize the point now made, as presenting a Federal question. If we could properly do so, as a matter of sincere deference to the higher court, or as a matter of courtesy to the distinguished counsel, we should not be reluctant to make such declaration as would enable a review of our decision by the higher court. But judicial candor compels us to say that we see no Federal question involved. The decree below will be modified as above indicated, and otherwise affirmed.